UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
UNITED STATES OF AMERICA,                           )
                                                    )
        v.                                          )        Criminal No. 07-0012 (ESH)
                                                    )
QUEEN NWOYE,                                        )
                                                    )
        Defendant.                                  )
_____ )

OPINION

        This matter is before the Court following an evidentiary hearing on defendant's

motion to vacate, set aside, correct sentence and conviction, and grant defendant a new trial

pursuant to 28 U.S.C. § 2255. The first day of the evidentiary hearing was conducted before the

trial judge, Judge Ellen Segal Huvelle, on March 13, 2014. Unable to complete the hearing that

day, Judge Huvelle continued the hearing to a later date. In the interim, Judge Huvelle became

unavailable to conduct the remainder of the hearing due to injury. The pending motion then was

referred to the undersigned by consent. *See* Loc. Crim. R. 57.13(a). In advance of resuming the

hearing on July 29, 2014, the undersigned familiarized himself with the record, as required by

Rule 25 of the Federal Rules of Criminal Procedure and Rule 63 of the Federal Rules of Civil

Procedure. *See* Fed. R. Governing Section 2255 Proceedings for the United States District

Courts 12 (applying both Federal Rules of Criminal Procedure and Federal Rules of Civil

Procedure to Section 2255 proceedings absent direct contradiction with the authorizing statute).

The parties further consented to this transfer on the record at the hearing on July 29.

Defendant argues that her trial counsel was ineffective for failing to call an expert witness on battered woman's syndrome ("BWS"), on the theory that had the trial judge heard such testimony she would have given a duress instruction and, as a result, at least one juror would have voted for acquittal. Upon consideration of the papers filed by the parties, the transcript of the trial and other relevant proceedings, the evidence presented during the two-day evidentiary hearing, and the entire record in the case, the Court will deny defendant's motion.[1]

## I. BACKGROUND

### A. Facts

In 2002, defendant Queen Nwoye, a Nigerian living in the United States, was working as a pharmacy technician. *See United States v. Nwoye*, 663 F.3d 460, 461 (D.C. Cir. 2011); *see also* Trial Tr., 10/30, at 88. One day, she noticed the name of one of the prescribing physicians, Dr. Ikembe Iweala, and, based on his name, suspected that they were from the same region of Nigeria. Ms. Nwoye called Dr. Iweala in the hopes that the two could meet. They did meet and soon became friends and, though both were married, eventually became lovers. *See United States v. Nwoye*, 663 F.3d at 461; Trial Tr., 10/30, at 90-93.

---

[1] The Court will use the following abbreviations in this Opinion for references to the proceedings and filings cited: Status Conference, Sept. 17, 2007 ("Sept. 17 Tr."); Evidentiary Hearing, Mar. 13, 2014 ("Mar. 13 Tr. Evid."); Evidentiary Hearing, July 29, 2014 ("July 29 Tr. Evid."); Trial Transcript ("Trial Tr., mm/dd, at page #"); Defendant's Motion to Vacate, Set Aside, and Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Mot."); Government's Opposition to Defendant's Motion to Vacate, Set Aside, and Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Opp."); Defendant's Reply ("Reply"); Defendant's Response to Court Order ("Def. Response"); Government's Supplemental Memorandum ("Gov't Supp."); and Defendant's Supplemental Memorandum ("Def. Supp.").

Though it is not entirely clear from the record exactly how long their affair lasted, it is clear that by 2005 it had ended.[2] That same year, Ms. Nwoye separated from her husband – though they continued to live in the same home. Soon after this separation, Ms. Nwoye began a romantic relationship with another Nigerian living in the United States named Adrienne Osuagwu (who, unbeknownst to Nwoye, was also married). *United States v. Nwoye*, 663 F.3d at 461. This relationship quickly turned abusive. As Ms. Nwoye testified at trial, Mr. Osuagwu physically abused her for the first time in December 2005, when he travelled to Nigeria to see her while she was there to attend her father's funeral. Trial Tr., 11/1, at 369-70. This abuse did not end in Nigeria, however, and over the next several months there were additional acts of physical abuse. According to Ms. Nwoye's testimony at trial, Mr. Osuagwu slapped her with an open hand, hit her with his shoes, and "would end up beating me up like a drum and I was just helpless." *Id.* at 372.

In addition to her testimony about Mr. Osuagwu's physical abuse, Ms. Nwoye also testified at trial about Mr. Osuagwu's emotionally abusive behavior and his efforts to take financial control over her. For example, in January 2006, according to Ms. Nwoye, Mr. Osuagwu forced her to move out of her husband's home and into an apartment in Maryland that he rented for them. He also forced her to provide him with her ATM cards and PIN numbers. *See* Trial Tr., 11/1 at 360-61. Using this financial information, Osuagwu purchased a California home in Ms. Nwoye's name without her knowledge or consent. While Ms. Nwoye lived in their shared apartment in Maryland, Mr. Osuagwu took several trips to California, spending between

---

[2] The court of appeals described the relationship as lasting for "a few months in 2002." *See United States v. Nwoye*, 663 F.3d at 461. Ms. Nwoye testified at the evidentiary hearing that the affair lasted for "several years" from 2002 until "like 2005." *See* Mar. 13 Tr. Evid., at 90. At trial, Dr. Iweala testified that the affair lasted until about August 2004. Trial Tr., 10/30, at 155-56.

three days and a week at a time.  *Id.* at 364-68, 381.  When Mr. Osuagwu was not present in

Maryland, Ms. Nwoye testified, he required her to wear a wireless earpiece at all times so that

she could answer his calls, even while she attended her nursing school courses.  *See id.* at 443.

Mr. Osuagwu also allegedly told Ms. Nwoye that he was a retired FBI agent.  *See* Trial Tr.,

10/30, at 98, 166; Trial Tr., 10/31, at 400.

       In February 2006, Ms. Nwoye disclosed her earlier affair with Dr. Iweala to Mr.

Osuagwu.  *See United States v. Nwoye*, 663 F.3d at 462; Trial Tr., 10/31, at 309.  Because Dr.

Iweala's wife was a high-ranking Nigerian government official, Mr. Osuagwu decided to use this

information in order to extort money from Dr. Iweala.  Between February and April of 2006, Dr.

Iweala paid Mr. Osuagwu and Ms. Nwoye a total of $185,000.  *United States v. Nwoye*, 663 F.3d

at 462.  Though Ms. Nwoye's specific role in the extortion plot was greatly disputed at trial, it is

undisputed that on three occasions she met with Dr. Iweala alone and collected money from him

directly.  On one of these occasions, on March 10, 2006, Ms. Nwoye met Dr. Iweala in a hospital

parking lot and suggested they there engage in sexual relations.  Trial Tr., 10/30, at 116-18.  Just

as Dr. Iweala began to unzip his pants, Mr. Osuagwu, who was waiting nearby, took a series of

photographs in order to extort additional money from Dr. Iweala.  *Id.*  Ms. Nwoye testified at

trial that Mr. Osuagwu forced her to participate in this scheme.  Trial Tr., 11/1, at 373-74.

       Ultimately, in April or May of 2006, Dr. Iweala decided that he would no longer

be blackmailed and informed his wife about his affair.  Trial Tr., 10/31, at 213.  He also

informed Mr. Osuagwu and Ms. Nwoye that he was done paying them money to cover up the

affair and, unbeknownst to Mr. Osuagwu and Ms. Nwoye, contacted the FBI.  *Id.* at 214.

       Ms. Nwoye continued to live in Maryland with Mr. Osuagwu.  In either June or

July of 2006, she visited him in California.  *See* Mar. 13 Tr. Evid., at 82-83, 88.  Soon after the

trip to California, Ms. Nwoye learned that Mr. Osuagwu was married to another woman.  *Id.* at

86.  She then broke off the relationship and returned to her husband.  Trial Tr., 11/1, at 381.  She

also contacted the Nigerian Economic and Financial Crime Commission ("EFCC") on two

occasions to inform it of Mr. Osuagwu's criminal activities:  first in June 2006 by telephone and

again in August 2006 by e-mail.  *Id.* at 380-81.

### B.  Trial

On November 16, 2006, Ms. Nwoye and Mr. Osuagwu were arrested and charged

with extortion, in violation of 18 U.S.C. § 875(d).  Mr. Osuagwu pled guilty, while Ms. Nwoye

decided to proceed to trial.  She was initially represented by an attorney from the Federal Public

Defender's Office.  Then, at the urging of friends and family, she retained a private attorney

named Stanley Baritz to represent her at trial.   Mar. 13 Tr. Evid., at 61.  The day before trial was

scheduled to begin, however, Mr. Baritz informed the Court at a status conference that his client

wanted to retain new counsel.  *See* Sept. 17 Tr., at 2-3.  According to Ms. Nwoye, she and

Mr. Baritz had difficulty communicating.  *See* Mar. 13 Tr. Evid., at 79.  The Court therefore

allowed Mr. Baritz to withdraw from the case and permitted John Iweanoge, whom Ms. Nwoye

had retained, to enter an appearance on her behalf.  Ms. Nwoye explained at the evidentiary

hearing that she hired Mr. Iweanoge because he better understood her since Mr. Iweanoge is also

of Nigerian descent and speaks her native language.  *Id.*

At the status conference, Mr. Iweanoge asked for a continuance of the trial

scheduled to begin the following morning, so that he could prepare for trial.  *See* Sept. 17 Tr., at

3-4.  He said:

> Judge, I've spoken to Mr. Baritz.  And the way the case is prepared
> to proceed at this point will be slightly different from the way I
> would proceed with the case if I was to try it. Right now from the

> trial transcript there are no other defense witnesses. There are no
> defense witnesses, let me put it like that. I would like an
> opportunity at least [a] very short opportunity to one, investigate
> the case a little further. And then two, while investigating the case
> and preparing for trial [to] be able to speak to my client further
> about the possibility of a disposition and then talk to the United
> States further.
>
> I started the conversation before Your Honor took the bench. And
> then additionally and more importantly, there may be a likelihood
> based on the information that Ms. Nwoye has brought to my
> attention to date that they may be using expert witnesses, more
> than likely a psychologist, but I haven't made that full
> determination because I haven't even gotten a copy of the file to
> even look at the trial discovery to be ready for trial tomorrow,
> judge.

*Id.* Judge Huvelle granted Mr. Iweanoge's request and continued the trial for six weeks. *See id.*

Despite Mr. Iweanoge's request for additional time to consider calling a psychologist as an expert witness, no such expert witness was ever noticed or called. The only witness to testify on behalf of Ms. Nwoye at trial was Ms. Nwoye herself. *See* Trial Tr., 10/31, 285-87. Before Nwoye began testifying and outside the presence of the jury, the government argued that "as a matter of law, unless she can show that she was in imminent physical danger, then [Mr. Iweanoge] should not be allowed to ask questions to suggest that she was either a battered woman or under any kind of duress because it's not here." *Id.* at 294. Judge Huvelle disagreed, explaining that "frankly, my view is [that] she can tell her story." *Id.* at 296. After Ms. Nwoye had begun her testimony, the government renewed its objection, and Judge Huvelle decided that the prudent course would be for defense counsel to make a factual proffer outside the presence of the jury as to what his client's further testimony likely would be. Mr. Iweanoge made this proffer and the Court recessed for the day to consider the issue.

When the parties returned the following morning, the government withdrew its objection and stated that "our position is we are not going to seek to prevent her from testifying.

But our position is she's still not going to be entitled to the duress instruction." Trial Tr., 11/1, at 356. In response, Judge Huvelle concluded that "given the Government's position, I'm certainly not going to stop her from testifying. I think that her testimony will be permitted given the Government's position. Then whether or not we do anything in terms of the instruction, the Government's position will be she hasn't made out a prima facie case." *Id.*

Ms. Nwoye continued her testimony, after which the defense rested. Mr. Iweanoge then requested that the jury be instructed on the affirmative defense of duress. Judge Huvelle denied Mr. Iweanoge's request, explaining:

> [T]he law is very clear. She has to have had no reasonable legal alternative to committing the crime . . . . The evidence here is completely devoid in that particular factor. She has got nothing to indicate that, in the times that he was away and the times that she was at school, the times that – this guy wasn't holding a gun to her head every day, every minute. I don't even think that the imminent threat of death or bodily injury has been shown there. But I don't need to rest on that at all.
>
> The Court finds that that instruction does not apply here. That's not what it's meant to be whatsoever. So that even if she could make out the first two elements, there has been not a scintilla of evidence that she had no reasonable opportunity to escape the threatened harm. So the instruction doesn't apply. Now, if you mention anything to do with duress or coercion, we're going to stop the closing. You'll lose your time, and we'll have to take up what kind of instruction the jury is going to get. You can argue the Government hasn't proven their case beyond a reasonable doubt. You cannot say that she didn't have specific intent because she was under duress or coercion.

Trial Tr., 11/1, at 448-49. In accordance with this instruction, Mr. Iweanoge did not specifically mention coercion or duress in his closing argument. He focused instead on telling his client's story and arguing that she did not have the requisite criminal intent necessary to commit the crime of extortion – in part because she "was being used by the devil himself," a not so subtle reference to Mr. Osuagwu. That same day, the jury returned a unanimous verdict of guilty.

*C. Court of Appeals Decision*

Ms. Nwoye, now represented by the Federal Public Defender's Office, appealed her conviction, in large part on the ground that Judge Huvelle had improperly denied the defense request to instruct the jury on duress. *See United States v. Nwoye*, 663 F.3d at 462. In a 2-1 decision, Judge Brown (writing on behalf of herself and Judge Williams) affirmed the conviction; Judge Tatel dissented. The majority reasoned that "[w]ithout denying the compelling nature of Osuagwu's alleged threats or the abuse Nwoye claims to have received, Nwoye's testimony falls far short of the duress claimed in, and ultimately denied, by our precedents." *Id.* at 463. Specifically, the court of appeals agreed with Judge Huvelle's conclusion that Nwoye "had ample opportunities to notify law enforcement either directly or indirectly, or, even more basically to avail herself of reasonable, legal alternative[s] to committing the crime." *Id.* (internal quotation marks and citations omitted). It noted that Ms. Nwoye regularly left her home to attend nursing school classes and to work at the hospital and was thus "physically separated" from Osuagwu. *Id.* She also met alone with Dr. Iweala and did not tell him that she was being forced to extort money from him. *Id.* Most importantly, the court of appeals emphasized that "Osuagwu spent nearly two weeks in California, thousands of miles away from Nwoye," giving her more than enough opportunity to notify law enforcement. *Id.* at 463-64. "[A] defendant with such 'countless opportunities to contact law enforcement authorities or [to] escape the perceived threats' cannot as a matter of law avail herself of the duress defense." *Id.* at 464 (quoting *United States v. Scott*, 901 F.2d 871, 874 (10th Cir. 1990)).

Regarding Nwoye's claim that she may have suffered from BWS, the majority explained that "Nwoye suggests the mere whiff of [BWS] arising from these facts should alter the duress determination." *United States v. Nwoye*, 663 F.3d at 465. But "her theory is devoid

of the other usual indicia supporting a BWS defense – expert witnesses testifying to the effects of isolation, financial dependence, or estrangement from family members Indeed, as discussed earlier, Nwoye had many alternative sources of protections and support, . . . [including] access to relatives, classmates, and teachers with whom she could seek refuge." *Id.* (internal citations omitted). Furthermore, "[s]he was not under constant visual surveillance. The conspiracy in which she participated lasted for months, [and there were] weeks in which Osuagwu was thousands of miles away." *Id*.

In dissent, Judge Tatel explained that, in his view, Ms. Nwoye was unquestionably entitled to a duress instruction for two reasons: (1) she was physically abused and emotionally controlled, and (2) she did not believe she could tell the police because she thought Mr. Osuagwu was "an FBI guy," and, therefore, she reasonably believed "the police would neither protect her nor investigate him." *United States v. Nwoye*, 663 F.3d at 467-68 (Tatel, J., dissenting). In Judge Tatel's words, "[t]o the American-born, highly educated, legally sophisticated judges of this court, Nwoye's fears are unreasonable. . . . But to obtain a duress instruction . . . [s]he needed only a reasonable belief that the police would refuse to protect her, and reasonableness is quintessentially a question for the jury." *Id*. at 468.

### D. Evidentiary Hearing

Four witnesses testified during the course of the two-day evidentiary hearing. The first witness was Dr. Carole Giunta, a forensic psychologist. Dr. Giunta evaluated Ms. Nwoye prior to the hearing and prepared a brief report. *See* Def. Response Attachment. In her report, Dr. Giunta explained BWS and some of its causes and symptoms. She also concluded that, in her medical opinion, Ms. Nwoye suffered from "a pattern typical of battering relations" at the time she helped Mr. Osuagwu extort money from Dr. Iweala. *Id*. at 3. Dr. Giunta's in-

court testimony corroborated the conclusions she reached in her report. *See* Mar. 13 Tr. Evid., at 13. She also explained why, when faced with ongoing violence and threats of violence, people suffering from BWS do not extricate themselves from the relationship. *Id*. at 21-22, 53.

The second witness to testify at the hearing was Ms. Nwoye. Her testimony focused primarily on her professional relationship and conversations with Mr. Iweanoge, her consultation with Dr. Giunta, and the alleged abuse that she suffered at the hands of Mr. Osuagwu. Of primary importance to this Court, Ms. Nwoye testified that Mr. Iweanoge never discussed with her the possibility of calling an expert witness and never explained BWS to her. *See* Mar. 13 Tr. Evid., at 63-64.[3] She also testified that it was her decision, in consultation with her then-husband, to retain Mr. Iweanoge. *Id*. at 79-80. She acknowledged that she was present in the courtroom when Mr. Iweanoge requested additional time in order to prepare for trial. *Id*. at 72.

The third witness who testified was Mr. Iweanoge. His testimony focused primarily on three areas: (1) how the decision was reached not to call an expert witness on BWS at trial, (2) how he handled the records of the case after the completion of the trial, and (3) his conversations with defendant's present attorney, Federal Public Defender A.J. Kramer, after the present motion was filed. On the first issue, Mr. Iweanoge testified that he requested additional time to prepare for trial in part because he "was thinking about the battered women's syndrome and . . . duress or coercion. Because based on what she was relating to me, I felt like they may be viable defenses because – but then not being a psychologist myself, I needed a diagnosis to be made to be able to support because there was nothing in the file that the two previous attorneys

---

[3]     This testimony was consistent with Ms. Nwoye's sworn declaration filed in conjunction with the pending motion, in which she stated that "Mr. Iweanoge did not explain to me about the need for an expert witness on battered woman syndrome," and that she "did not tell Mr. Iweanoge that [she] believed such an expert was not necessary." Reply, Attachment at 1.

have ever consulted with anyone." Mar. 13 Tr. Evid., at 107. Mr. Iweanoge testified that he told

Judge Huvelle at the status conference that "based on what I know that there may be need for the

services of a psychologist." *Id*. at 105.[4] He further testified that he explained to his client the

benefits of her seeing a psychologist to determine if it would be helpful to call a psychologist as

an expert witness at trial. *See id*. at 102, 105-10. He also said he contacted a potential expert

named Dr. Olarinde. *Id*. at 109-10. Mr. Iweanoge testified that in speaking with Ms. Nwoye, he

specifically remembered using the words "battered women's syndrome," "duress," and

"coercion." *Id*. at 107. But then, according to Mr. Iweanoge, at a subsequent meeting Ms.

Nwoye told him that the cost of retaining an expert was too great and that she would just tell her

story to the jury; and she therefore had "no need to see an expert." *Id.* at 111.[5]

Mr. Kramer questioned Mr. Iweanoge at great length as to whether he discussed

the potential availability of Criminal Justice Act ("CJA") funds for an expert witness. When

pressed, Mr. Iweanoge testified that he did not discuss the issue of CJA funds with his client

because he believed she had sufficient resources to have made her ineligible under CJA

eligibility standards. *See* Mar. 13 Tr. Evid., at 152. He based this belief on the fact that both he

and Mr. Baritz had been retained and that Ms. Nwoye worked as a registered nurse. *See id.* at

---

[4]     The transcript of the status conference corroborates Mr. Iweanoge's recollection on this point. *See* Sept. 17 Tr., at 4 ("I started the conversation before Your Honor took the bench. And then additionally and more importantly, there may be a likelihood based on the information that Ms. Nwoye has brought to my attention to date that they may be using expert witnesses, more than likely a psychologist, but I haven't made that full determination because I haven't even gotten a copy of the file to even look at the trial discovery to be ready for trial tomorrow, judge.")

[5]     This testimony was consistent with Mr. Iweanoge's sworn affidavit in which he stated that he "counseled [her] that we may need an expert witness on battered women syndrome for her defense," and "she rejected our consulting and retaining an expert witness in battered woman syndrome [because s]he believed that such an expert witness was not necessary given the facts of her case which she intended to explain to the Jury and was not willing to expend her funds for such an expert." Opp., Ex. 1.

153.  Furthermore, Mr. Iweanoge believed that registered nurses make at least $25 an hour, which he believed would have rendered her ineligible for CJA funds.  *See* July 29 Tr. Evid., at 32.  Mr. Iweanoge also testified that Ms. Nwoye could not pay his entire fee immediately and that she did not complete payment until after she was released from prison.  *See id.* at 6-7.

On the second and third issues, Mr. Iweanoge testified at length about his inability to locate the relevant case file after the completion of the trial and his belief that he had turned the file over to the Federal Public Defender's Office, by way of a courier, at the time that Office took over the case on appeal.  He also testified about conversations that he had with Mr. Kramer regarding the case.  *See* Mar. 13 Tr. Evid., at 154-60.

The last witness to testify was Mr. Kramer.  His brief testimony focused exclusively on his interactions with Mr. Iweanoge following the filing of the present motion and the issue of the missing case file.

## II.  DISCUSSION

### A.  Legal Standard

To prevail on a claim of ineffective assistance of counsel, a defendant carries the burden of demonstrating that (1) her "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *see also United States v. Shabban*, 612 F.3d 693, 697 (D.C. Cir. 2010).  Regarding the first prong, the Supreme Court has emphasized that "judicial scrutiny of counsel's performance must be highly deferential."  *Strickland v. Washington*, 466 U.S. at 689.  As for the second, or "prejudice" prong of the *Strickland* test, the Supreme Court has explained that "[a]n error by counsel, even if professionally unreasonable,

does not warrant setting aside the judgment of a criminal proceeding, if the error had no effect on the judgment." *Hill v. Lockhart*, 474 U.S. 52, 57 (1985) (quoting *Strickland v. Washington*, 466 U.S. at 691) (alteration in original) (internal quotation marks omitted).

The *Strickland* prejudice prong requires only a reasonable probability – that is "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. at 694. As the court of appeals recently clarified, "[t]he prejudice inquiry focuses on whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Solofa*, 745 F.3d 1226, 1229 (D.C. Cir. 2014) (internal citations and quotation marks omitted). And where the error claimed is a failure to pursue an affirmative defense, "the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id*. Finally, because the movant must satisfy both prongs of the test in order to succeed, "there is no reason for a court deciding an ineffective assistance of counsel claim to . . . address both components of the inquiry if the defendant has made an insufficient showing on one." *Strickland v. Washington*, 466 U.S. at 697.

### B. Defendant's Motion

#### 1. Mr. Iweanoge's Representation

While the parties agree on very little concerning Mr. Iweanoge's representation of Ms. Nwoye, they do agree on two facts: first, that Ms. Nwoye was present in the courtroom when Mr. Iweanoge requested additional time to consider calling an expert witness; and second, that Mr. Iweanoge never discussed the potential availability of CJA funds for an expert witness with his client. Based on these two undisputed facts alone, it is clear that Mr. Iweanoge failed to fully exercise his professional duties.

The Criminal Justice Act provides that investigative, expert, or other services necessary for adequate representation may be paid from government funds for any defendant who is financially unable to obtain such services. 18 U.S.C. § 3006A(e)(1). The rules governing the CJA expressly state that "[i]nvestigative, expert, or other services necessary to adequate representation, as authorized by subsection (e) of the Criminal Justice Act (18 U.S.C. § 3006A), are available to persons who are eligible under the CJA, *including persons who have retained counsel* but who are found by the court to be financially unable to obtain the necessary services." 7A GUIDE TO JUDICIARY POLICY § 310.10.10(a) (emphasis added). To be sure, Ms. Nwoye may not have qualified for CJA funds, but that was a matter for the trial judge to determine. *See id.* §§ 310.10.10(b), 310.10.20. What is clear from Mr. Iweanoge's own affidavit and his in-court testimony at the evidentiary hearing is that he failed to inform his client that such funds *might* be available and that he failed to inquire into her financial situation. Instead, he simply assumed that because he had been retained and his client was employed as a nurse, she was ineligible for CJA funds.

This was a mistake. The CJA rules expressly recognize that even individuals who are financially able to retain counsel may still be eligible for CJA funds for expert witnesses. Therefore, it was Mr. Iweanoge's duty to discuss the possible availability of such funds with his client and to further investigate his client's financial situation. *See United States v. Burroughs*, 613 F.3d 233, 238 (D.C. Cir. 2010) ("According to Burroughs, his lawyers realized that his mental health was relevant to the sentencing decision and went so far as to suggest he undergo a mental health evaluation, but they failed to request CJA funding for one. If their failure to seek funding under the CJA reflected ignorance of the law, rather than a reasonable strategic decision, . . . then the [attorneys'] performance must be deemed deficient." (alterations in original)

(internal quotation marks and citations omitted)); *see also Dando v. Yukins*, 461 F.3d 791, 798-99 (6th Cir. 2006).

The record also shows that Mr. Iweanoge failed to provide appropriate advice and counsel to his client regarding the benefits of calling an expert witness. Either, as Ms. Nwoye contends, Mr. Iweanoge failed to discuss the possibility of calling an expert witness altogether or, as Mr. Iweanoge testified, he discussed the possibility of an expert witness with Ms. Nwoye but deferred to her judgment not to pursue such an expert either for monetary or strategic reasons. In either case, his counsel was deficient. For counsel to rely on his client's belief that an expert was not necessary because she would be vindicated through her own testimony and explanation of events to the jury, Opp., Ex. 1 at ¶ 7; Mar 13, Tr., at 108-11, was to abrogate his own professional responsibilities.

As the government correctly notes in its supplemental memorandum, Rule 1.2 of the D.C. Rules of Professional Conduct expressly states that "a lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued." The comment clarifying that Rule states that "a clear distinction between objectives and means sometimes cannot be drawn, and in many cases the client-lawyer relationship partakes of a joint undertaking." *Id.* cmt. 1. With respect to the means used to pursue the objectives, "the lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected." *Id.* The decision whether to call an expert witness is just such a decision; while it may be financial in nature, it also implicates a strategic choice in which the lawyer should play an active role. *See*, *e.g.*, *Hoover-Hankerson v. United States*, 792 F. Supp. 2d 76, 84 (D.D.C. 2011) (citing *United States*

*v. Valencia-Rios*, 639 F. Supp. 2d 98, 106-07, 110 (D.D.C. 2009)) (describing the decision whether to call an expert witness as within "the range of reasonable professional assistance")

Moreover, under Rule 1.4(b) of the Rules of Professional Conduct, "a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The commentary to that Rule states that "the lawyer must be particularly careful to ensure that decisions of the client are made only after the client has been informed of all relevant considerations. The lawyer must initiate and maintain the consultative and decision-making process if the client does not do so and must ensure that the ongoing process is thorough and complete." *Id*. cmt. 2; *see also* Def. Supp. at 3. Here, Mr. Iweanoge failed to "maintain the consultative and decision-making process." Instead, even accepting Mr. Iweanoge's version of the facts, he relied on his client's decision to forego an expert for strategic and monetary reasons. *See* Mar. 13 Tr. Evid., at 111 ("[S]he believed that she will be fine because she planned to testify."). The Court concludes that Mr. Iweanoge failed to provide the necessary strategic advice to his client under the Rules of Professional Conduct.

The government responds to this argument in its supplemental memorandum by arguing that "defense counsel in this case believed the defendant could successfully present a duress defense without a BWS expert." Gov't Supp. at 3. There is no testimony from Mr. Iweanoge, however, that this was his view or that it ever even crossed his mind; rather, he simply deferred to Ms. Nwoye's decision not to employ an expert. *See, e.g.*, Mar. 13 Tr. Evid., at 153 ("I wouldn't say that she didn't have the money. I just say that she wasn't willing to spend it."). Whether his argument that Ms. Nwoye was under duress or his effort to get a duress instruction could have been strengthened by expert testimony is a strategic decision that Mr.

Iweanoge should not have ceded to his client – even if it had turned out, after exploring her eligibility for CJA funds, that she was responsible for paying for such an expert.

But the Court need not reach a conclusion on whether Mr. Iweanoge's professional failures rise to the level of violations of "an objective standard of reasonableness" under *Strickland* and its progeny. Rather, as the Supreme Court has made clear, "there is no reason for a court deciding an ineffective assistance of counsel claim to . . . address both components of the inquiry if the defendant has made an insufficient showing on one." *Strickland v. Washington*, 466 U.S. at 697. For the reasons discussed below, the Court concludes that the defendant has failed to meet her burden of establishing prejudice. Her motion therefore will be denied on this ground alone.

### 2. Prejudice

In defendant's view, her trial counsel's failure to call an expert witness on BWS unduly prejudiced her in two ways. First, she argues that had Mr. Iweanoge been permitted to call an expert witness, there is a reasonable probability that Judge Huvelle would have instructed the jury on the affirmative defense of duress. Second, she argues that if after hearing expert testimony on BWS, Judge Huvelle had failed to instruct the jury on duress, there is a reasonable probability that the court of appeals would have reversed this decision. *See* Mot. at 27-28; July 29 Tr. Evid., at 90. In either scenario, defendant maintains – as she must in order to succeed on her motion – that as a result of such expert testimony and an appropriate duress instruction, there is also a reasonable probability that at least one juror would have voted for acquittal, resulting in a hung jury. Because the Court finds these arguments unconvincing, it must deny defendant's motion.

There is no D.C. Circuit decision holding that expert testimony on BWS is admissible to support an affirmative defense of duress. Traditionally, expert testimony on BWS has been limited to cases where a defendant puts forward the affirmative defense of self-defense. *See Nixon v. United States*, 728 A.2d 582, 589 (D.C. 1999) ("[T]he Supreme Court of Michigan has recognized that the majority of jurisdictions favor the admissibility of expert testimony regarding the battered woman syndrome [in support of a claim of self-defense]." (quoting *People v. Christel*, 537 N.W.2d 194, 202 n.26 (1995))); *see also, e.g.*, *State v. B.H.*, 870 A.2d 273, 280 (N.J. 2005) ("[T]o some degree, most jurisdictions accept battered woman syndrome evidence to support a claim of self-defense."); *State v. Koss*, 551 N.E.2d 970, 973 (Ohio 1990) ("Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense."); *State v. Hennum*, 441 N.W.2d 793, 797-98 (Minn. 1989) (expert testimony permitted on BWS in context of self-defense).

When courts first moved on from the self-defense realm to consider the question whether evidence concerning BWS was also relevant to the affirmative defense of duress, they generally concluded that it was not. *See generally* Kelly Grace Monacella, *Supporting A Defense of Duress: The Admissibility of Battered Woman Syndrome*, 70 TEMP. L. REV. 699 (1997). The Fifth Circuit, for example, held that "while evidence that a defendant is suffering from [] battered woman's syndrome provokes [] sympathy, it is not relevant, for purposes of determining criminal responsibility, to whether the defendant acted under duress." *United States v. Willis*, 38 F.3d 170, 177 (5th Cir. 1994). The *Willis* court reasoned that duress had always been a defense based on the hypothetical objectively reasonable person, and that permitting evidence of BWS

would impermissibly render the test subjective.  *Id*. at 175.  Such a defense, the court observed, necessarily relates to why this particular "unusually susceptible" defendant succumbed rather than why the hypothetical objectively reasonable person would.  *Id*. at 175-76 ("[S]ubjective evidence [of BWS] is irrelevant."); *see also United States v. Johnson*, 956 F.2d 894 (9th Cir. 1992) (rejecting the use of BWS evidence for purposes of duress in case-in-chief at trial, but permitting such evidence at sentencing); *United States v. Sixty Acres in Etowah County*, 930 F.2d 857, 861 (11th Cir. 1991) (evidence of battered woman's fear is insufficient to establish the "legal standard [of duress] whose essential elements are absent").

More recently, however, some courts have reached a different conclusion as to whether expert testimony on BWS is admissible in the context of a duress defense.  These courts conclude that if BWS is appropriate in the self-defense arena as a way to demonstrate a fear of imminent harm, it would not make sense to prevent such evidence in the duress context.  As the Sixth Circuit explained in a 2006 case:

> [T]he theory of Battered Woman's Syndrome is not at odds with a reasonableness requirement – if anything, evidence of Battered Woman's Syndrome can potentially bolster an argument that a defendant's actions were in fact reasonable. Although those of us who are not so unfortunate to have to live with constant, imminent threats of violence might look at the actions of a defendant in [defendant's] situation from the relative comfort of a judge's chambers or a jury box and wonder what reasonable person would have facilitated [the] shocking crime spree, evidence of Battered Woman's Syndrome can explain why a reasonable person might resort to such actions given a history of violent abuse and the imminent violent threats.

*Dando v. Yukins*, 461 F.3d at 801; *see also United States v. Marenghi*, 893 F. Supp. 85, 96 (D. Me. 1995) ("This Court cannot envision that such evidence should be excluded in a duress defense when it is admitted in an overwhelming majority of state courts in self-defense cases.");

*State v. B.H.*, 870 A.2d at 288 ("Expert testimony can be useful to a jury assessing the sincerity of a defendant's perception of a threat in connection with a duress defense.").[6]

This Court agrees that expert evidence on BWS may be admitted in support of a duress defense in appropriate circumstances for the benefit of the jury. *See*, *e.g.*, *United States v. Marenghi*, 893 F. Supp. at 94-95 ("Expert testimony [on BWS] could be helpful to explain to the jury how a reasonable person reacts to repeated beatings and emotional abuse."). Such expert testimony, however, should always be limited to general testimony about the causes and symptoms of BWS as opposed to testimony – like that provided by Dr. Giunta – that the particular defendant herself likely suffered from BWS. As the D.C. Court of Appeals has explained, "courts [across the country] have held or suggested that testimony by the expert to the effect that the complainant was a battered woman should be excluded as unduly prejudicial and because it would invade the province of the jury." *Nixon v. United States*, 728 A.2d at 592 (collecting cases); *see also*, *e.g.*, *Arcoren v. United States*, 929 F.2d 1235, 1241 (8th Cir. 1991) (permitting expert testimony on BWS generally as it did not impinge upon the jury's role in determining credibility); *State v. Grecinger*, 569 N.W.2d 189, 194 (Minn. 1997) ("[T]he expert should not be permitted to testify on the ultimate fact of whether the particular defendant actually suffers from battered woman syndrome."). *But see*, *e.g.*, *People v. Humphrey*, 921 P.2d 1, 4 (Cal. 1996) (permitting an expert to testify that particular defendant suffered from BWS).

That being said, defendant points this Court to no cases – nor is the Court aware of such a case – which stands for the proposition that such general expert testimony about BWS

---

[6]     The Model Penal Code takes a similar position, explaining that "the [duress] standard is thus partially objective; the defense is not established simply by the fact that the defendant was coerced; he must have been coerced in circumstances under which a person of reasonable firmness *in his situation* would likewise have been unable to resist." MODEL PENAL CODE § 2.09, Explanatory Note (2001) (emphasis added).

is equally necessary for the benefit of a trial judge to assist her in determining whether there is a sufficient factual foundation to give the jury a duress instruction.[7] The fact is that many judges – and certainly the trial judge in this case – already have a general knowledge about the basic causes and symptoms of BWS from their professional experience and training. *See* Trial Tr., 11/1, at 320 ("I know about battered [woman's] syndrome.").[8] As a result, the probative value of such testimony, if any, is minimal. Moreover, it would make little sense to conclude that a trial court judge who was already familiar with the kind of testimony that an expert witness likely would have given would have reached a different conclusion after hearing such testimony afresh.

Even if an expert witness had been permitted to testify about the causes and symptoms of BWS in this case, however – even before a judge less knowledgeable about BWS than Judge Huvelle – the Court is satisfied that there still would have been an inadequate evidentiary foundation based on Ms. Nwoye's testimony for the Court to have instructed the jury on the affirmative defense of duress. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) (defendant entitled to jury instruction as to any recognized defense "for which there exists evidence sufficient for a reasonable jury to find in his favor"); *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008) (defendant entitled to theory of defense instruction only where there

---

[7]     The trial court judge plays a crucial gatekeeping role when deciding whether and what to instruct juries on affirmative defenses, since the trial judge is charged with determining whether there is a sufficient evidentiary foundation to support a particular affirmative defense. *See United States v. Bailey*, 444 U.S. 394, 416 (1980) (discussing "requirement of a threshold showing on the part of those who assert an affirmative defense to a crime"). But it does not follow that the trial judge in her role as gatekeeper needs an expert to help her decide whether there is a sufficient evidentiary foundation for a requested instruction. *Cf. In re Salem*, 465 F.3d 767, 776-77 (7th Cir. 2006) (where "the gatekeeper and the factfinder are one and the same," the court may hear the evidence and make its own determination without the aid of an expert).

[8]     Judge Huvelle served as a trial judge in the Superior Court of the District of Columbia for nine years and served in the Civil, Criminal, and Family Divisions of that court. She also served as an attorney in one of the earliest BWS cases in this jurisdiction. *See Ibn-Tamas v. United States*, 407 A.2d 626 (D.C. 1979).

is "sufficient evidence from which a reasonable jury could find for the defendant on his theory");
*United States v. Glover*, 153 F.3d 749, 754-55 (D.C. Cir. 1998) (refusal to give entrapment instruction affirmed where defendant produced insufficient evidence of inducement).

In the context of duress, this means that a judge must instruct a jury on the defense of duress only when the defendant presents at least some evidence on both of the necessary elements of the defense. "To prevail on a duress defense, a defendant must convince the jury that (1) she acted under the threat of immediate death or serious bodily injury, and (2) that she had no reasonable legal alternative to committing the crime, *i.e.*, no chance both to refuse to do the criminal act and also to avoid the threatened harm." *United States v. Nwoye*, 663 F.3d at 467 (Tatel, J., dissenting) (internal quotation marks and citations omitted).[9] "A defendant 'cannot claim duress when he had, but passed up, an opportunity to seek the aid of law enforcement officials.'" *United States v. Gaviria*, 116 F.3d 1498, 1531 (D.C. Cir. 1997) (quoting *United States v. Rawlings*, 982 F.2d 590, 593 (D.C. Cir. 1993)). Nor, as in this case, can she claim duress when she had "relatives, classmates, and teachers with whom she could seek refuge." *United States v. Nwoye*, 663 F.3d at 465. "If the defendant had any reasonable, legal alternative to committing the crime, the defense of duress will not obtain . . . . [A] defendant need not produce strong evidence to obtain a jury instruction on duress. Where, however, the evidence is insufficient as a matter of law to support a finding of duress, the district court's refusal to instruct the jury on duress is not erroneous." *United States v. Jenrette*, 744 F.2d 817, 820-21 (D.C. Cir. 1984).

---

[9] In an unpublished opinion, the court of appeals described the defense of duress similarly, albeit with three essential elements: "(1) an immediate threat of death or bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." *United States v. Weekly*, No. 92-3053, slip op. at 2 (D.C. Cir. Nov. 13, 1992) (citing *United State v. Jennell*, 749 F.2d 1302, 1305 (9th Cir. 1984)).

In this case, Judge Huvelle provided the defendant with ample opportunity to present evidence in support of both of these necessary elements. She permitted the defendant to testify at length about the abuse that she said she had suffered at the hands of Mr. Osuagwu. In addition to Ms. Nwoye's testimony about her abuse, the judge also heard evidence that undercut defendant's theory of the case, including evidence that (1) Mr. Osuagwu frequently left the D.C.-Maryland area without her, taking trips to California that lasted days or weeks; (2) Ms. Nwoye left Mr. Osuagwu and returned to her husband in the summer of 2006 without incident; and (3) Ms. Nwoye eventually contacted the Nigerian security services regarding Mr. Osuagwu's criminal behavior.

Based on the totality of this evidence, Judge Huvelle concluded that defendant's case was "completely devoid" of evidence that Ms. Nwoye "had no reasonable legal alternative to committing the crime," and that "this guy wasn't holding a gun to her head every day, every minute." Trial Tr., 11/1, at 448-49. Though she indicated that she also believed the defendant had not sufficiently demonstrated "imminent threat of death or bodily injury," Judge Huvelle expressly declined to rest on this factor. "[E]ven if [Ms. Nwoye] could make out the [other] elements [of a duress defense]," Judge Huvelle concluded, "there has been not a scintilla of evidence that she had no reasonable opportunity to escape the threatened harm." *Id*. This decision was subsequently affirmed by the court of appeals. *United States v. Nwoye*, 663 F.3d at 465.

Defendant now argues that had Judge Huvelle heard expert testimony on battered woman's syndrome, she "could not have relied upon the fact that Osuagwu 'wasn't holding a gun to her head every day, every minute.'" Mot. at 28. This argument reads way too much into Judge Huvelle's metaphor and mischaracterizes the relevant legal inquiry. The "immediate

threat" element of duress includes a subjective element:  that is, a defendant need only show that

*she reasonably believed* there was such a threat.  *See United States v. Jenrette*, 744 F.2d at 821

("Assuming that Jenrette *reasonably believed* Weinberg and Amoroso were gangsters and that

this belief produced a *reasonable fear . . . .*" (emphases added)).  By contrast, the requirement

that the defendant had "no reasonable legal alternative to committing the crime" is objective: that

is, a defendant must show that she *actually* had no chance both to refuse to do the criminal act

and to avoid the threatened harm.  *United States v. Gaviria*, 116 F.3d at 1531.    As the court of

appeals explained in its opinion:

> This Court has affirmed denials of the duress defense even
> in quite harrowing situations. In *Gaviria*, we denied the defense for
> a defendant whose teenage daughter was in the physical custody of
> a co-conspirator, with a history of physical abuse against the
> daughter, who coerced the defendant's cooperation for thirteen
> months "by reminding him that [the daughter] was 'in his hands.'"
> 116 F.3d at 1531. But, because of the defendant's "ample
> opportunities" to inform his daughter, other members of his family,
> his daughter's school principal, or any number of other people
> about that threat, we concluded the defendant's claim of duress
> "border[ed] upon the frivolous." *Id.*  The requirement of
> immediacy is also not equivocal. A defendant who had just two
> days between the receipt of a threat and the inception of the
> conspiracy during which he could have contacted the authorities or
> sought help failed to meet it.  *Jenrette*, 744 F.2d at 821.
>
> Our sister Circuits have imposed a similarly high bar. In
> *United States v. Alicea*, the Second Circuit denied the defense to
> female defendants forced to transport drugs after having been
> raped by their captors, told they were under constant visual
> surveillance during a nine-hour plane flight, and threatened with
> the deaths of their families if they failed to cooperate because they
> could have "complain[ed] to the cabin attendants" during the flight
> or sought assistance from Immigration and Customs officers after
> landing.  837 F.2d 103, 105-06 (2d Cir. 1988); *see also R.I.
> Recreation Ctr. v. Aetna Cas. & Sur. Co.*, 177 F.2d 603, 604-05
> (1st Cir. 1949) (affirming denial of defense for defendant accosted
> by armed men who drove him at gunpoint to his office building,
> ordered him to take money out of his safe, and threatened they
> would "take care of" his family if he did not comply, because the

threat was of "future unspecified harm" and because he was free in the minutes he was alone in the office building to call someone for help).

*United States v. Nwoye*, 663 F.3d at 463.

Contrary to defendant's position, it simply is not a sufficient predicate for a duress instruction in this Circuit to show that, as a result of BWS or otherwise, the particular defendant believed that she had no reasonable legal alternative to committing the crime. Rather, in order for the defendant to be entitled to a duress instruction, she must adduce evidence at trial showing that she herself in fact had no reasonable legal alternative. *See United States v. Gaviria*, 116 F.3d at 1531; *United States v. Jenrette*, 744 F.2d at 820-21. Because no amount of expert testimony could rectify this evidentiary deficiency, the Court concludes that there was no prejudice to the defendant by virtue of her lawyer's failure to offer expert testimony on BWS for presentation to Judge Huvelle at trial.

Defendant's second argument is that if Judge Huvelle had heard expert testimony on BWS and then still failed to instruct the jury on duress, there is a reasonable probability that the court of appeals would have reversed that decision. *See* July 29 Tr. Evid., at 90. In support of this position, defendant relies heavily, if not exclusively, on the single sentence in the majority opinion that "[defendant's] theory is devoid of the other usual indicia supporting a BWS defense – expert witnesses testifying to the effects of isolation, financial dependence, or estrangement from family members." *United States v. Nwoye*, 663 F.3d at 465. From this sentence, defendant would have this Court extrapolate that had Ms. Nwoye presented such evidence, the majority would have reached a different conclusion.

A careful review of the majority opinion, however, demonstrates that the lack of expert testimony was only one reason among many upon which the court of appeals relied in

affirming Judge Huvelle's decision. In fact, in the sentence that follows the one relied upon so heavily by the defendant, the court explained that a duress defense was not appropriate in light of the evidence that Nwoye "had many alternative sources of protection and support" – including "access to relatives, classmates, and teachers with whom she could seek refuge." *United States v. Nwoye*, 663 F.3d at 465. In addition, the court emphasized that "she was not under constant visual surveillance," and the "conspiracy in which she participated lasted for months." *Id.* For these reasons, the court concluded that, "[c]ompared to the duress claims of defendants who had only days, or even minutes, in which they could have sought help, Nwoye's claim of duress is incredibly thin. If the attempts of those defendants to avail themselves of a duress defense failed, then *a fortiori*, Nwoye's attempt must fail as well." *Id.* (internal citations omitted). Ultimately, just as with defendant's claim regarding Judge Huvelle's decision not to give a duress instruction, what was missing was not expert testimony on BWS, but rather sufficient evidence to support defendant's claim that she had no reasonable legal alternative to committing the crime. Absent such evidence, the Court sees no reason why either of the judges in the majority would reach a different conclusion.

Therefore, defendant's motion will be denied on the grounds that Mr. Iweanoge's professional failures failed to prejudice Ms. Nwoye's defense.

### III.  CONCLUSION

For the foregoing reasons, the defendant's motion for relief under 28 U.S.C.

§ 2255 is denied.  An Order consistent with this Opinion will issue this same day.


/s/_____
PAUL L. FRIEDMAN

DATE: August 25, 2014                    United States District Judge